**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

LARRY HINMAN, ANNA DOSE,
*aka* Ann Dose, and CARLA WEBER,

           Defendants.

No. CR04-4082-MWB

**REPORT AND
RECOMMENDATION ON
MOTIONS TO DISMISS PORTIONS
OF SECOND SUPERSEDING
INDICTMENT**

_____

### *TABLE OF CONTENTS*

**I.**   **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

**II.**   **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

**III.**   **DISCUSSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **14**

    **A.**     **Double Jeopardy: The First Look** . . . . . . . . . . . . . . . . . . . . . **15**

        **1.**     **Counts Two and Three of the Indictment** . . . . . . . . . . . . . **15**

        **3.**     **Counts Four and Five of the Indictment** . . . . . . . . . . . . . . **26**

    **B.**     **Double Jeopardy: The Second Look** . . . . . . . . . . . . . . . . . . . . . **28**

    **C.**     **Sufficiency of Charging Language in Count Six** . . . . . . . . . . . . . **32**

**IV.**   **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34**

# I. INTRODUCTION

This matter once again is before the court on motions to dismiss filed by the defendants Anna Dose and Larry Hinman.[1]  Dose has filed a motion (Doc. No. 106) to dismiss Counts Three and Five of the Second Superseding Indictment (Doc. No. 94) on the basis of double jeopardy.  Dose incorporates by reference the double jeopardy arguments she made on other grounds in her challenge to the First Superseding Indictment.  (Doc. No. 106 at ¶ 17, incorporating Doc. No. 52)  Hinman has filed a motion to dismiss, or to require the Government to elect between, "multiplicitous counts" in the Second Superseding Indictment.  (Doc. No. 113)  Hinman also incorporates by reference the double jeopardy arguments he advanced in his challenge to the First Superseding Indictment, as well as his claim that Count Six (formerly Count Nine) fails to allege an offense.  (*See* Doc. Nos. 57, 58, 109 ¶ 9)

The plaintiff (the "Government") filed a joint resistance to Dose's and Hinman's current motions (Doc. No. 116[2]), and the Government previously briefed the issues raised by Dose and Hinman in their previous motions.  (*See* Doc. Nos. 53, 68, 69, & 74)  Hinman filed a reply to the Government's resistance (Doc. No. 119), and the Government filed a response to Hinman's reply (Doc. No. 123).

Pursuant to the trial scheduling orders filed September 2 and October 5, 2004 (Doc. Nos. 11 & 39), pretrial motions in this case were assigned to the undersigned United States Magistrate Judge for review, and the issuance of a report and recommended disposition.  The court previously held an evidentiary hearing on Dose's and Hinman's

---

[1]Dose and Hinman will be referred to collectively herein as "the defendants."  The defendant Carla Weber has not joined in Dose's and Hinman's motions.

[2]The Government docketed its resistance separately under each of Dose's and Hinman's names, *see* Doc. Nos. 116 and 117, but there is only one document.

earlier motions, and the undersigned issued a Report and Recommendation on those motions (Doc. No. 88), to which the defendants filed objections. However, due to the filing of the Second Superseding Indictment, Chief Judge Mark W. Bennett found the defendants' prior motions to dismiss/strike to be moot. (Doc. No. 122) The court held telephonic oral arguments on the current motions, and reasserted issues from the prior motions, on April 14, 2005. Assistant United States Attorney Sean R. Berry appeared on behalf of the Government. Hinman appeared with his attorneys William S. Smith and Jan Mohrfeld Kramer. Dose appeared with her attorney R. Scott Rhinehart. Weber appeared with her attorney Anne M. Laverty.

Finding the motions to be fully submitted, the court turns to consideration of Dose's and Hinman's motions.

## II.  BACKGROUND

The court is quite familiar with the facts of this case, having reviewed several previous pretrial motions. Briefly, the Government alleges that during an audit of the Indian Hills Nursing Home ("Indian Hills") in connection with its certification to continue receiving Medicare and Medicaid funding, the defendants attempted to conceal a fall and injury suffered by a resident of Indian Hills.

The present motions relate to a six-count Second Superseding Indictment (hereafter simply "the Indictment") that was returned against the defendants on February 16, 2005. (Doc. No. 94) Both Dose and Hinman claim the Indictment charges them in multiplicitous counts, violating their Fifth Amendment right against double jeopardy. Specifically, they claim Counts Two and Three charge them with identical conduct, constituting a single offense, and similarly, Counts Four and Five charge them with identical conduct, constituting a single offense. Hinman seeks dismissal of either Count

2 or Count 3, and either Count 4 or Count 5, or alternatively, an order requiring the Government to elect between those multiplicitous Counts. Dose specifically requests dismissal of Counts Three and Five.

In addition to the arguments raised in the present motions, which Dose characterizes as "a second double jeopardy issue" (Doc. No. 107, ¶ 1(c)), the defendants continue to assert that they cannot be charged with violations of Title 18, United States Code, sections 1035 and 1001, on the basis of identical conduct. (*See id.*; Doc. No. 106 ¶ 17; Doc. No. 109, ¶¶ 7 & 8) Hinman also continues to assert that Count Six (formerly Count 9) of the Indictment fails to allege adequately a violation of Title 18, United States Code, section 1516. (*Id.*, ¶ 9) Dose and Hinman reassert and incorporate by reference their previous arguments on these issues. (*See* Doc. No. 107, ¶ 1(c); Doc. No. 109, ¶¶ 7, 8, & 9)

The parties' earlier arguments on these issues were considered in the undersigned's Report and Recommendation filed January 12, 2005. (Doc. No. 88) The court will restate its analysis of those issues here. \*\*\***The parties are cautioned that they must file new objections to this Report and Recommendation. They may not incorporate their previous objections by reference.**\*\*\*

Before turning to a discussion of the merits, the court will set forth the relevant portions of the Indictment.

All four of Counts Two through Five incorporate by reference the following allegations contained in Count One:

INTRODUCTION

1.      At all times relevant to this indictment:

A.	Care Initiatives Inc. ("Care Initiatives") was a corporation that operated nursing homes in Iowa.  Care Initiatives' main office was located in West Des Moines, Iowa.

B.	Indian Hills Nursing and Rehab Center ("Indian Hills"), located in Sioux City, Iowa, was among the nursing homes operated by Care Initiatives.  Indian Hills received Medicare and Medicaid funds for health care items, benefits and services it provided to the beneficiaries of these health care benefit programs.  Medicare and Medicaid were health care benefit programs affecting commerce as defined in Title 18, United States Code, § 24(b).  Care Initiatives and Indian Hills received in excess of $100,000 in funds from each of these programs during a continuous one-year period that included June 1999.

C.	The Health Care Financing Administration ("HCFA") was an agency of the United States Department of Health and Human Services ("DHHS").  HCFA and DHHS were a part of the executive branch of the United States government.  HCFA's purpose was, in part, to determine whether nursing facilities should be certified and receive funds under Medicare and Medicaid, and to monitor and ensure the quality of care given to residents of Medicare and Medicaid certified entities.

D.	The Iowa Department of Inspections and Appeals ("DIA") operated as an agent of HCFA, and conducted inspections ("surveys") of Medicare and Medicaid certified entities, including Indian Hills, for and on behalf of HCFA.  The DIA surveys were used by HCFA to determine whether nursing home facilities should be certified and receive funds under Medicare and Medicaid.  The DIA surveys were also used by HCFA to monitor and ensure the quality of care given to residents of Medicare and Medicaid certified entities.  At the conclusion of a survey, DIA informed the surveyed facility of any deficiencies in the quality of care identified during the survey.  When deficiencies were identified by DIA in an initial visit, DIA would conduct a revisit of the facility to determine whether the facility had adequately addressed the deficiency.  Deficiencies found on the revisit were reported to HCFA.  Deficiencies, depending on the type and severity, could result in monetary penalties and other sanctions against a facility, including up to termination from the Medicare and Medicaid programs.

E.    Defendant LARRY HINMAN was employed by Care Initiatives as a Divisional Director.  Defendant HINMAN's duties included supervising the administrators and monitoring DIA surveys at the Care Initiatives nursing homes in his region.  Indian Hills was among the nursing homes for which defendant HINMAN was responsible.

F.    Defendant ANNA DOSE, also known as Ann Dose, was employed by Care Initiatives as a nurse consultant.  Defendant DOSE was assigned to work with certain Care Initiatives facilities, including Indian Hills.  Among other things, defendant DOSE was responsible for preparing these facilities for DIA surveys.  Defendant DOSE closely monitored the progress of DIA surveyors as they conducted their surveys.   In 1998, defendant DOSE was directed by her supervisor to lower the number of deficiencies in the facilities that she worked with, including the number of deficiencies at Indian Hills.  Defendant DOSE's supervisor believed that Indian Hills had higher deficiency numbers than the state average.

G.    Defendant CARLA WEBER was employed by Care Initiatives as a supervisory nurse at Indian Hills.  As a supervisory nurse, defendant WEBER was responsible for, among other things, supervising nurses and other Care Initiatives employees in the performance of their duties, and, at times, was responsible for providing requested information to DIA surveyors.

.   .   .

THE MANNER AND MEANS OF THE CONSPIRACY

3.    The conspiracy was accomplished in the following ways, among others:

A.    In or about May 1999, DIA conducted a survey at Indian Hills on behalf of HCFA.   During the survey, DIA identified a number of deficiencies.  Among other things, DIA found that Indian Hills staff was not properly ensuring that each resident received adequate supervision and assistance deices to prevent accidents.  This was a significant deficiency because it involved an injury to a resident.  At the conclusion of the survey, DIA notified Indian Hills of the deficiencies.

B.     On or about June 14, 1999, an 84-year-old Indian Hills resident with a history and high risk of falling ("the injured Indian Hills resident") fell from a gerichair – a chair similar to a wheelchair – and was seriously injured.  The injured Indian Hills resident required immediate medical attention, including stitches to close a wound on her face.  Soon thereafter, the co-conspirators concluded that the injured Indian Hills resident's fall and injury was of the same type that had resulted in DIA's May 1999 determination that Indian Hills staff was not properly ensuring that each resident received adequate supervision and assistance devices to prevent accidents.

C.     Beginning on approximately June 23, 1999, and continuing through approximately June 25, 1999, DIA, on behalf of HCFA, revisited Indian Hills to determine if, among other things, Indian Hills had remedied the significant deficiency found by DIA in May 1999.  DIA sought to determine if Indian Hills had achieved and maintained compliance with its obligation to properly ensure that each resident received adequate supervision and assistance devices to prevent accidents.

D.     During the DIA revisit, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, and others known and unknown to the Grand Jury, concealed and attempted to conceal the injured Indian Hills resident's fall and injury from the DIA surveyor.  In particular, in response to the DIA surveyor's request for a list of the names of Indian Hills residents who had fallen or been injured since the May 1999 survey, the co-conspirators created and provided, and caused to be created and provided, a list from which they deliberately excluded the name of the injured Indian Hills resident.  The co-conspirators also caused the injured Indian Hills resident to be physically turned in her room in an effort to prevent the DIA surveyor from seeing the injured Indian Hills resident's injury.  The co-conspirators also caused the injured Indian Hills resident's medical chart to be hidden from the DIA surveyor in an effort to prevent the DIA surveyor from learning of the injured Indian Hills resident's fall and injury.

OVERT ACTS

4.     In furtherance of the conspiracy and to effect the objects of the conspiracy, defendants LARRY HINMAN, ANNA DOSE and CARLA

WEBER, committed the following overt acts, among others, in the Northern District of Iowa:

A.    Sometime between about June 14, 1999, and about June 25, 1999, defendants LARRY HINMAN and ANNA DOSE discussed the injured Indian Hills resident's fall and injury, and the effect that the fall and injury could have on DIA's conclusions when the DIA surveyor revisited Indian Hills.  During that discussion, defendants HINMAN and DOSE agreed to take steps to conceal the injured Indian Hills resident's fall and injury from the DIA surveyor.

B.    Sometime between about June 14, 1999, and about June 25, 1999, defendants ANNA DOSE and CARLA WEBER discussed the injured Indian Hills resident's fall and the effect the fall and injury could have on DIA's conclusions when DIA revisited Indian Hills.

C.    Sometime between about June 23, 1999, and about June 25, 1999, defendant LARRY HINMAN called the administrator at Indian Hills and told the administrator that the DIA surveyor should not be given information regarding the injured Indian Hills resident's injury.

D.    Sometime between about June 23, 1999, and about June 25, 1999, defendants ANNA DOSE and CARLA WEBER agreed to withhold the injured Indian Hills resident's name from the DIA surveyor in an effort to conceal the injured Indian Hills resident's fall.

E.    Sometime between about June 23, 1999, and about June 25, 1999, following the DIA surveyor's request for a list of residents who had fallen or been injured since the May 1999 survey, defendant CARLA WEBER prepared the list, but intentionally omitted the injured Indian Hills resident's name from the list.

F.    Sometime between about June 23, 1999, and about June 25, 1999, defendant CARLA WEBER caused the fraudulently incomplete list of residents who had fallen and suffered an injury since the May 1999 survey to be provided to the DIA surveyor.

G.    Sometime between about June 23, 1999, and about June 25, 1999, defendant LARRY HINMAN spoke with defendant CARLA WEBER and instructed her not to point the surveyor to the injured Indian Hills

resident, and to keep the surveyor as far away from the injured Indian Hills resident as possible.

H.      Sometime between about June 23, 1999, and about June 25, 1999, defendants ANNA DOSE and CARLA WEBER attempted to conceal the injured Indian Hills resident's injury from the DIA surveyor by instructing subordinates to physically place the injured Indian Hills resident in her room so that the injured Indian Hills resident's injury would not be visible to the DIA surveyor as he completed his revisit.

I.      Sometime between about June 23, 1999, and about June 25, 1999, defendants ANNA DOSE and CARLA WEBER attempted to conceal the injured Indian Hills resident's injury from the DIA surveyor by hiding and instructing others to hide the injured Indian Hills resident's medical chart from the DIA surveyor as the DIA surveyor completed his survey.

J.      On or about June 25, 1999, after learning that the DIA surveyor had discovered the injured Indian Hills resident's injury despite their efforts to fraudulently conceal it, defendants ANNA DOSE and CARLA WEBER met and decided what they would tell the surveyor about their failure to disclose the injured Indian Hills resident's injury on the list of injuries provided to the surveyor.

K.      On or about June 25, 1999, defendant CARLA WEBER, in the presence of defendant ANNA DOSE, told the DIA surveyor that she (defendant WEBER) had left the injured Indian Hills resident's name off of the list of residents who fell or were injured in an effort to protect Indian Hills.  At this meeting, defendants WEBER and DOSE intentionally hid from the surveyor that defendants DOSE and HINMAN were also involved in the scheme to hide the injured Indian Hills resident's injury.

(Doc. No. 94, ¶¶ 1 and 1A-1G, 3A-3D, 4A-4K)

In Counts Two and Three, the defendants are charged with violating Title 18, United States Code, section 1035(a), which provides as follows:

> (a)      Whoever, in any matter involving a health care benefit program, knowingly and willfully –
>> (1)   falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or

> (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.
>
> (b) As used in this section, the term "health care benefit program" has the meaning given such term in section 24(b) of this title.

18 U.S.C. § 1035.

Section 24(b) defines "health care benefit program" as

> any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

18 U.S.C. § 24(b).

Count Two "repeats, realleges, and incorporates by reference" each of the allegations from Count One that are quoted above. (Doc. No. 94, Count Two ¶ 5) Count Two then charges the defendants as follows:

> 6. Beginning on or after June 14, 1999 and continuing through at least on or about June 25, 1999, within the Northern District of Iowa, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, in a matter involving the Medicare and Medicaid health care benefit programs, and in connection with the delivery of and payment for health care items, benefits and services, knowingly and willfully concealed and covered up, and caused to be concealed and covered up, by trick, scheme, and device, a material fact, namely that the injured Indian Hills resident had fallen and been injured at Indian Hills after DIA's May 1999 Indian Hills survey.

This in violation of Title 18, United States Code, Sections 1035(a)(1) and 2(a) & (b).

(*Id.,* Count Two ¶ 6)

Count Three similarly incorporates by reference the quoted allegations from Count One. (*Id.,* ¶ 7) Count Three then charges the defendants as follows:

8.      Between on or about June 23 and on or about June 25, 1999, within the Northern District of Iowa, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, in a matter involving the Medicare and Medicaid health care benefit programs, and in connection with the delivery of and payment for health care items, benefits and services, did:

A.      knowingly and willfully make, and cause[] to be made, a materially false, fictitious, and fraudulent statement and representation, in that defendant WEBER, aided, abetted, counseled, commanded, induced and procured by defendants DOSE and HINMAN, falsely, fictitiously, and fraudulently represented to the DIA surveyor that she had informed the DIA surveyor of all relevant Indian Hills residents who had fallen or suffered injuries since DIA's May 1999 Indian Hills survey, when, in truth and in fact, and as defendants well knew, defendant WEBER had failed to inform the DIA surveyor that the injured Indian Hills resident had fallen and suffered an injury at Indian Hills since DIA's May 1999 Indian Hills survey; and

B.      knowingly and willfully make and use, and cause to be made and used, a material false writing and document, in that defendant WEBER, aided, abetted, counseled, commanded, induced and procured by defendants DOSE and HINMAN, created and presented, and caused to be created and presented, a list to the DIA surveyor which purported to contain all of the relevant names of Indian Hills residents who had fallen and suffered injuries since DIA's May 1999 Indian Hills survey, when, in truth and in fact, and as defendants well knew, the document was materially false, fictitious and fraudulent, in that the document omitted the name of the injured Indian Hills resident who had fallen and suffered an injury at Indian Hills since DIA's May 1999 Indian Hills survey.

This in violation of Title 18, United States Code, Sections 1035(a)(2) and (2)(a) & (b).

(*Id.*, Count Three, ¶ 8)

Counts Four and Five charge the defendants with violating Title 18, United States Code, section 1001(a), which provides as follows:

> (a)  Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully --
>
> (1)  falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2)  makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3)  makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1001(a).

Count Four realleges and incorporates by reference the allegations from Count One quoted above (*see* Doc. No. 94, Count Four ¶ 9), and then charges the defendants as follows:

> 10.  Beginning on or after June 14, 1999 and continuing through at least on or about June 25, 1999, within the Northern District of Iowa, in a matter within the jurisdiction of HCFA, DHHS and the executive branch of the United States government, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER knowingly and willfully concealed and covered up, and caused to be concealed and covered up, by trick, scheme, and device, a material fact from the DIA surveyor, namely that the injured Indian Hills resident had fallen and been injured at Indian Hills after DIA's May 1999 Indian Hills survey.

This in violation of Title 18, United States Code, Sections 1001(a)(1) and 2(a) & (b).

(*Id.*, Count Four ¶ 10)

Count Five also realleges and incorporates by reference the above-quoted allegations from Count One (*see* Doc. No. 94, Count Five ¶ 11), and then charges the defendants as follows:

12.     Between on or about June 23 and on or about June 25, 1999, within the Northern District of Iowa, in a matter within the jurisdiction of HCFA, DHHS and the executive branch of the United States government, defendants CARLA WEBER, LARRY HINMAN and ANNA DOSE, did:

A.     knowingly and willfully make, and cause to be made, a materially false, fictitious and fraudulent statement and representation in that defendant WEBER, aided, abetted, counseled, commanded, induced and procured by defendants DOSE and HINMAN falsely, fictitiously, and fraudulently represented to the DIA surveyor that they [sic] had informed the DIA surveyor of all relevant Indian Hills residents who had fallen or suffered injuries since DIA's May 1999 Indian Hills survey, when, in truth and in fact, and as defendants well knew, defendant WEBER had failed to inform the DIA surveyor that the injured Indian Hills resident had fallen and suffered an injury at Indian Hills since DIA's May 1999 Indian Hills survey; and

B.     knowingly and willfully make and use, and cause to be made and used, a material false writing and document, in that defendant WEBER, aided, abetted, counseled, commanded, induced and procured by defendants DOSE and HINMAN, created and presented, and caused to be created and presented, a list to the DIA surveyor which purported to contain all of the relevant names of Indian Hills residents who had fallen and suffered injuries since DIA's May 1999 Indian Hills survey, when, in truth and in fact, and as defendants well knew, the document was materially false, fictitious and fraudulent, in that the document omitted the name of the injured Indian Hills resident who had fallen and suffered an injury at Indian Hills since DIA's May 1999 Indian Hills survey.

This in violation of Title 18, United States Code, Sections 1001(a)(2) & (a)(3) and (2)(a) & (b).

(*Id.*, Count Five, ¶ 12)

Finally, in Count Six, after again incorporating by reference the allegations from Count One, the Government charges the defendants as follows:

14.    Beginning on or after June 14, 1999 and continuing through at least on or about June 25, 1999, within the Northern District of Iowa, defendants LARRY HINMAN, ANNA DOSE and CARLA WEBER, with intent to deceive the United States, endeavored to influence, obstruct, and impede a Federal auditor, namely a DIA surveyor, in the performance of official duties relating to an entity, namely Indian Hills, that received in excess of $100,000, directly or indirectly, from the United States in a one year period that included June 1999, under a contract, subcontract, grant, and cooperative agreement.

This in violation of Title 18, United States Code, Sections 1516 and 2(a) & (b).

(*Id.*, Count Six ¶ 14)


### III.  DISCUSSION

All Counts of the Indictment are based on the events that allegedly occurred in the latter part of June 1999, when the Government alleges the defendants attempted to conceal, and misreported by omission, the fall and injury suffered by a resident of Indian Hills.  Chief Judge Mark W. Bennett briefly summarized the charges set forth in the Indictment as "conspiracy to commit health care fraud, in violation of 18 U.S.C. § 371, making false statements related to health care matters, in violation of 18 U.S.C. §§ 1035 and 2, making false statements to the Health Care Financing Administration, in violation of 18 U.S.C. §§ 1001 and 2, and obstruction of a federal audit, in violation of 18 U.S.C. §§ 1516 and 2." (Doc. No. 122, p. 3)  The defendants advance two different arguments

that the Indictment violates the Double Jeopardy Clause.  First, they claim Counts Two and Three, on one hand, and Counts Four and Five, on the other hand, are multiplicitous because each of those sets of Counts involves identical conduct that occurred at one point in time.  They argue that convicting them on two Counts under each statute (*i.e.*, section 1035 and section 1001) would result in multiple convictions for the same conduct, violating their right against double jeopardy. Second, they reassert their previous argument that identical facts are required to prove a violation of both section 1035 and section 1001, and charging them under both statutes for the same conduct is redundant and violates their right against double jeopardy.  Hinman also reasserts his previous argument that Count Six (formerly Count 9), charging the defendants with obstructing a federal audit, fails to state a claim against the defendants.

### A.  Double Jeopardy:  The First Look

### 1.    Counts Two and Three of the Indictment

The defendants argue Counts Two and Three are multiplicitous because those Counts involve identical conduct that occurred at one point in time.  They argue that convicting them on both Counts would result in multiple convictions for the same conduct, violating the Fifth Amendment's protection against double jeopardy.

In Count Two, the defendants are charged with violating subsection (a)(1) of section 1035, which prohibits falsifying, concealing, or covering up a material fact by trick, scheme or device.   18 U.S.C. § 1035(a)(1).   The Government alleges the defendants violated subsection (a)(1) when they attempted to conceal the fact that an Indian Hills resident had fallen and been injured.

In Count Three, the defendants are charged with violating subsection (a)(2) of section 1035, which prohibits the making of materially false, fictitious, or fraudulent

statements or representations. 18 U.S.C. § 1035(a)(2). The Government claims the defendants violated subsection (a)(2) when they "(1) fraudulently represented to the DIA surveyor that they had informed the DIA surveyor of all relevant injuries, and (2) fraudulently provided a false document to the DIA surveyor which omitted the name of the injured Indian Hills patient[.]" (Doc. No. 116, p. 2)

The defendants claim their alleged concealment of the resident's fall and injury, as charged in Count Two, and their allegedly fraudulent representations to the DIA surveyor, as charged in Count Three, are the same conduct. The Government disagrees, arguing the concealment and the false statements involved separate and distinct actions. Specifically, during oral argument the Government's counsel stated the concealment consists of the defendants' attempt to hide the injured Indian Hills resident by turning her so her injury would not be noticeable, and by hiding her medical chart from the DIA surveyor. Counsel further stated the actions constituting the misrepresentation included giving the DIA surveyor a list of Indian Hills residents who had fallen since the May 1999 survey, and omitting the injured resident's name from the list while telling the DIA surveyor that the list contained all of the relevant names. The Government's counsel indicated he would be bound by his representations on this point, and would not attempt, at trial, to prove Counts Two and Three using the same conduct (for example, he would not argue turning the injured Indian Hills resident and hiding her chart form the basis of the concealment count).

The defendants respond by noting both Counts incorporate *all* of the factual allegations from Count One, rather than incorporating only discrete factual allegations with respect to each charge. They assert this would allow the jury to find them guilty of both Counts on the basis of identical conduct, for example using the omission of the injured Indian Hills resident's name from the list given to the DIA surveyor as the basis

16

for a guilty verdict on both the concealment and the false statement charges. The Government counters that even if Count Two and Count Three rely on the same factual allegations, that is irrelevant so long as each offense requires proof of an element the other does not. The Government further argues the defendants' concerns in this regard can be addressed through careful drafting of jury instructions and the verdict form, but dismissal of charges is not the proper remedy.

Both Dose and the Government base their respective arguments on the test formulated by the United States Supreme Court in *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932); however, Dose and the Government disagree on application of the *Blockburger* test in the present case. Hinman, on the other hand, argues it is not clear the *Blockburger* test is applicable to these issues. (*See* Doc. No. 119) In arguing Count Two and Count Three are multiplicitous, Hinman relies on *United States v. Christner*, 66 F.3d 922 (8th Cir. 1995); *United States v. McIntosh*, 124 F.3d 1330 (10th Cir. 1997); and *United States v. Montilla Ambrosiani*, 610 F.2d 65, 68 (1st Cir. 1979).

The starting point for analyzing whether Counts Two and Three are multiplicitous is the Double Jeopardy Clause, which "'protects against multiple punishments for the same offense.'" *United States v. Ervasti*, 201 F.3d 1029, 1039 (8th Cir. 2000) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656 (1969), *overruled on other grounds*, *Alabama v. Smith*, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865 (1989)). "'In order to support a claim of double jeopardy, a defendant must show that the two offenses charged are in law and fact the same offense.'" *Id.* (quoting *United States v. Bennett*, 44 F.3d 1364, 1368 (8th Cir. 1995)); *accord United States v. Honken*, 271 F. Supp. 2d 1097, 1105 (N.D. Iowa 2003) (same).

Where appropriate, the Eighth Circuit Court of Appeals relies on the *Blockburger* "same elements" test to determine whether charged offenses are the "same offense" for double jeopardy purposes. *Ervasti*, 201 F.3d at 1039. The *Blockburger* test provides:

> "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

*Id.* (quoting *Blockburger*, 284 U.S. at 304, 52 S. Ct. 180).

The Supreme Court has summarized the *Blockburger* test as follows:

> In both the multiple punishment and multiple prosecution contexts, this Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the "same-elements" test, the double jeopardy bar applies. *See, e.g., Brown v. Ohio*, 432 U.S. 161, 168-169, 97 S. Ct. 2221, 2226-2227, 53 L. Ed. 2d 187 (1977); *Blockburger v. United States*, 284 U.S. 299, 304, 52 S. Ct. 180, 182, 76 L. Ed. 306 (1932) (multiple punishment); *Gavieres v. United States*, 220 U.S. 338, 342, 31 S. Ct. 421, 422, 55 L. Ed. 489 (1911) (successive prosecutions). The same-elements test, sometimes referred to as the "*Blockburger*" test, inquires whether each offense contains an element not contained in the other; if not, they are the "same offence" and double jeopardy bars additional punishment and successive prosecution.

*United States v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856, 125 L. Ed. 2d 556 (1993). *See Lewis v. United States*, 523 U.S. 155, 177, 118 S. Ct. 1135, 1147, 140 L. Ed. 2d 271 (1998) (Scalia, J. and Thomas J., concurring) ("Two offenses are different, for double jeopardy purposes, whenever each contains an element that the other does not. . . . That test can be easily and mechanically applied, and has the virtue of producing consistent and predictable results.") (citing *Blockburger*, 284 U.S. at 304, 52

S. Ct. at 182). *See also McIntyre v. Caspari*, 35 F.3d 338, 340 (8th Cir. 1994) ("[T]he Supreme Court has made clear that the *Blockburger* 'same-elements' test is the sole standard by which we must determine whether a subsequent prosecution violates the Double Jeopardy Clause." [Citations omitted.]).

The Eighth Circuit Court of Appeals has recognized that the Supreme Court, in *Missouri v. Hunter*, 459 U.S. 359, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983), further refined the *Blockburger* test to provide that "[e]ven if the elements of two offenses are the same, prosecution on the second charge is permissible under the Double Jeopardy Clause if the legislature intended that the second offense be separately punishable from the first." *United States v. Johnson*, 352 F.3d 339, 343 (8th Cir. 2003).

After a thorough review of the law applicable to the double jeopardy challenge the defendants raise here, the court finds particularly appropriate the Eighth Circuit's observation that "[s]tating the rule against multiplicity is a relatively simple proposition; discerning the proper judicial test for implementing the rule is, however, more difficult." *Christner*, 66 F.3d at 927. As the *Christner* court noted, "the issue of multiplicity arises in a wide variety of contexts." *Id.* For example, the *Blockburger* test applies when "distinct counts in the indictment charge the defendant for acts which, together, constitute a single offense but, individually, do not each constitute a separate offense," and "when a single act is the basis for charging two or more separate offenses, each for the violation of a separate statutory provision." *Id.* (citing *Blockburger*). However, although the *Blockburger* Court held the 'same elements' test is applicable when a defendant violates "*two distinct statutory provisions*," 284 U.S. at 304, 52 S. Ct. 180 (emphasis added), application of that holding is far from clear where, as here, a defendant is charged under two subsections of the same statute. Similarly difficult to apply here is the *Christner* court's observation that the *Blockburger* test does not apply when a defendant is charged

with separate prosecutions "for separate acts allegedly violating the *same* statutory provision." *Christner*, 66 F.3d at 928 n.7 (emphasis in original). The question is whether subsections (a) and (b) of section 1035 represent the same, or different, statutory provisions. Stated differently, "The relevant inquiry is whether the conduct in question was intended to give rise to more than one offense under the same statutory provision." *United States v. Erickson*, 2001 WL 1176316 (D.S.D. Aug. 31, 2001) (Moreno, Magistrate J.) (citing *United States v. McLaughlin*, 164 F.3d 1, 14 (D.C. Cir. 1998); *United States v. Rimell*, 21 F.3d 281, 287 (8th Cir. 1994)).

Section 1035 provides for imprisonment or a fine for certain knowing and willful conduct "in connection with the delivery of or payment for health care benefits, items, or services."[3] The relevant conduct is separated into two numbered subsections. The first subsection implicates someone who "falsifies, conceals, or covers up by any trick, scheme, or device a material fact[.]" 18 U.S.C. § 1035(a)(1). The second subsection implicates someone who "makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry[.]" 18 U.S.C. § 1035(a)(2).

Section 1035 was added to Title 18 as part of the Health Insurance Portability and Accountability Act of 1996. *See* H.R. Rep. 104-496(I) (1996). The entire section, including both subsection (a)(1) and subsection (a)(2), was added by Congress at the same time. *Id.* There is no discussion in the federal reports regarding Congress's intent in

---

[3]Notably, the placement of language within the statute further complicates the analysis. It appears that the conduct proscribed under both subsection (a)(1) and subsection (a)(2) must take place "in connection with the delivery of or payment for health care benefits, items, or services." It also appears that the penalties of a fine, imprisonment, or both, apply to the conduct proscribed in both subsections (a)(1) and (a)(2). However, the language describing these provisions appears only *within* subsection (a)(2).

separating section 1035(a) into two subparts. All we have is Congress's pronouncement that the law was intended "to combat waste, fraud, and abuse in health insurance and health care delivery[.]" *Id.* Similarly, the court has located no case law from any jurisdiction discussing the distinction, if any there is, between subsections (a)(1) and (a)(2). However, the *Christner* court's analysis provides some guidance here.

In *Christner*, the court considered whether charges in an indictment were multiplicitous where they involved the concealment of bankruptcy estate property from creditors. The facts considered in *Christner* will illustrate the case's applicability to the issues at hand. In *Christner*, the defendant filed a petition for relief under Chapter 11 of the Bankruptcy Code. His main creditor, a bank, filed a claim for approximately $156,000. The evidence at trial indicated that while his bankruptcy petition was still pending, the defendant transferred $25,800 into a bank account in his wife's name, and he failed to disclose the transfer to his creditors as required by Chapter 11. On a later date, the defendant sold some cattle and received $10,231.41, which he deposited into another bank account, again failing to disclose the matter to his creditors. The indictment charged the defendant in Count I with concealing the $25,800; in Count II, with concealing the $10,231.41; and in Count III with making a false statement under penalty of perjury when he submitted a monthly report in the bankruptcy proceeding, and failed to disclose the two transactions in the report.

All three Counts charged the defendant with violating 18 U.S.C. § 152, but Counts I and II charged him with violating subsection (1), while Count III charged him with violating subsection (3). Subsections (1) and (3) of section 152 subject to a fine, imprisonment, or both:

A person who –

>       (1) knowingly and fraudulently conceals from a custo-
> dian, trustee, marshal, or other officer of the court charged
> with the control or custody of property, or, in connection with
> a case under title 11, from creditors or the United States
> Trustee, any property belonging to the estate of a debtor; [or]
>
>       .   .   .
>
>       (3) knowingly and fraudulently makes a false declara-
> tion, certificate, verification, or statement under penalty of
> perjury as permitted under section 1746 of title 28, in or in
> relation to any case under title 11[.]

18 U.S.C. § 152.

The defendant was convicted and sentenced to concurrent terms of imprisonment on all three Counts. On appeal, he argued the Indictment contained multiplicitous counts in violation of the Double Jeopardy Clause. Specifically, although he conceded the two acts of concealment charged in Counts I and II could be separate offenses, *see Christner*, 66 F.3d at 928, the defendant argued that because the omissions from the financial reports alleged in Count III represented the identical funds the Government alleged were concealed in Counts I and II, "the false declaration charge in Count III unconstitutionally repeat[ed] the concealment charges in Counts I and II." *Id.*, 66 F.3d at 927.

As a preliminary matter, the Eighth Circuit noted the concurrent sentences "might suggest that double jeopardy is not in issue"; however, the court concluded that because the defendant received a statutory special assessment of $50.00 on each charge, he was "subjected to multiple punishments, within the meaning of the double jeopardy clause." *Christner*, 66 F.3d at 927 (citing *United States v. Grubbs*, 829 F.2d 18, 19 (8th Cir. 1987)).

The Eighth Circuit applied a two-part analysis formulated in *United States v. Bennett*, 44 F.3d 1364 (8th Cir. 1995), which the court explained as follows:

> In *Bennett*, the defendant raised a double jeopardy challenge to his successive prosecutions [FN6] for overlapping conspiracies. In that case, we held that both tests from *Blockburger* had to be satisfied in order for the successive prosecutions to pass constitutional muster; in other words, failure to pass either the statutory intent test or the same elements test would result in a double jeopardy violation. 44 F.3d at 1373. Citing *Garrett v. United States*, 471 U.S. 778, 105 S. Ct. 2407, 85 L. Ed. 2d 764 (1985), this court devised the following two-part analysis:
>
> > First, a court must ask whether Congress "intended that each violation be a separate offense." . . . If it did not, there is no statutory basis for the two prosecutions, and the double jeopardy inquiry is at an end. . . . Second, if Congress intended separate prosecutions, a court must then determine whether the relevant offenses constitute the "same offense" within the meaning of the Double Jeopardy Clause.
>
> *Bennett*, 44 F.3d at 1373 (citations omitted). As to this second inquiry, the court explained "[t]he double jeopardy bar applies only to prosecutions or convictions which cannot survive the 'same elements' test." *Id*. As stated above, "where the same act or transaction constitutes a violation of two distinct statutory provisions," the test "is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182. [FN7]
>
> > [FN6] The same analysis applies whether the double jeopardy issue arises as a result of multiple punishments or as a result of successive prosecutions. *United States v. Bennett*, 44 F.3d 1364, 1372 (8th Cir. 1995).

[FN7] We note that, where the double jeopardy challenge focuses on separate punishments or prosecutions for separate acts allegedly violating the *same* statutory provision, the "same elements" test, as enunciated in *Blockburger*, does not apply. In such cases, the issue is one of statutory intent. *See, e.g., United States v. Rimell*, 21 F.3d 281, 287 (8th Cir.) (because bank fraud statute was intended to be broadly construed, separate counts for each separate act of bank fraud held not to be multiplicitous), *cert. denied*, [513] U.S. [976], 115 S. Ct. 453, 130 L. Ed. 2d 362 (1994). These cases may also implicate the "unitary harm rule" which was applied by this court in *United States vs. Graham*, 60 F.3d 463, 467 (8th Cir. 1995).

*Christner*, 66 F.3d at 928-29 & nn. 6 & 7.

The *Christner* court found the indictment in that case met both the statutory intent test and the 'same elements' test, holding as follows:

Upon careful consideration of the language and structure of § 152, we hold that Congress intended that an act of intentionally concealing property of the bankruptcy estate and the act of knowingly making a false statement to the bankruptcy court under penalty of perjury constitute two separate offenses under the statute where, as in this case, the concealment and the statement were separate acts, even if the concealment and the false statement involved the very same property. Thus, the statutory intent test is met. Moreover, Counts I and II, alleging violations of § 152(1), required the government to prove concealment, which § 152(3) (making a false statement under penalty of perjury) did not; conversely, Count III, alleging a violation of § 153(3), required proof of

> a false statement made under penalty of perjury, which
> § 152(1) did not. Thus, the same elements test is also met.

*Christner*, 66 F.3d at 929.

The *Christner* court specifically distinguished *United States v. Montilla Ambrosiani*, 610 F.2d 65 (1st Cir. 1979), upon which Hinman relies. (*See* Doc. No. 113-2, p. 4) The court found a "significant distinction" between the facts of *Montilla* and the facts in *Christner*, noting that in the former case, the Government specifically charged only the nondisclosure of bankruptcy estate funds, and not any concealment in connection with the deposit of those funds. *See Christner*, 66 F.3d at 929 (citing *Montilla*, 610 F.2d at 68). The court explained:

> In other words, the government's position in *Montilla Ambrosiani* was that a single non-disclosure in a document filed with the bankruptcy court could support separate charges of both concealment and making a false statement. "To put it baldly, as the government did . . ., saying one has $5 when one has $10 is both a false statement and a concealment, and thus two separate offense." [Citation omitted.] In the present case, by contrast, the government has never claimed that the acts of concealment charged in Counts I and II occurred when defendant made the false statements in his monthly bankruptcy report. Rather the government alleged that defendant (1) knowingly and fraudulently concealed property of the bankruptcy estate *at the time he deposited the $25,800* in his wife's Putnam account and (2) knowingly and fraudulently concealed property of the bankruptcy estate *at the time he deposited the $10,231.41*, representing the proceeds from the cattle sale, into the account in the name of the Horseshoe Ranch Trust. [Footnote omitted.] Those being separate acts from the false statement charged in Count III, *Montilla Ambrosiani* does not apply.

*Christner*, 66 F.3d at 929-30 (emphasis in original).

The court finds *Montilla* to be distinguishable from the present case on similar grounds. The Government claims the defendants' actions in attempting to conceal the Indian Hills resident's injury from the DIA surveyor were separate and distinct from the defendants' false statements and representations to the DIA surveyor.

The court further finds the analysis in *Christner* is directly applicable in the present determination of whether subsections (a) and (b) of section 1035 constitute two separate offenses. The fact that Congress located two offenses under a single statute number does not make them the same statutory provision for purposes of determining whether or not the *Blockburger* 'same elements' test applies. Here, similar to the analysis in *Christner*, the concealment of the Indian Hills resident's fall and injury and the false statements to the DIA surveyor were separate acts, even though they arose from the same events. Thus, the court finds the statutory intent test is met.

Furthermore, Count Two, alleging a violation of subsection 1035(a), requires the Government to prove concealment or a coverup of the Indian Hills resident's fall and injury by a "trick, scheme, or device." Subsection 1035(b) does not require similar proof. Conversely, subsection 1035(b) requires proof that the defendants made a "materially false, fictitious, or fraudulent statement[] or representation[]," or they made or used a "materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." Subsection (a) does not require similar proof. The court therefore finds the 'same elements' test also has been met.

As a result, the court finds Counts Two and Three are not multiplicitous, and the defendants' motions should be denied as to Counts Two and Three.

**2.     *Counts Four and Five of the Indictment***

The defendants make an identical argument with respect to Counts Four and Five. In Count Four, they are charged with violating subsection (a)(1) of section 1001, which makes it a crime, in connection with "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States," to knowingly and willfully falsify, conceal, or cover up a material fact "by any trick, scheme, or device." 18 U.S.C. § 1001(a)(1). In Count Five, they are charged with violating subsections (a)(2) and (a)(3) of section 1001, which make it a crime, in connection with "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States," to knowingly and willfully make "any materially false, fictitious, or fraudulent statement or representation," or to make or use "any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." 18 U.S.C. § 1001(a)(2) & (3).

The identical analysis applies to both section 1035 and section 1001. In section 1001, Congress intended that the act of concealment by trick, scheme or device and the act of making a false statement or representation, orally or in writing, would constitute separate and distinct offenses. Count Four requires proof of facts that Count Five does not, and the converse also is true. Both the statutory intent test and the 'same elements' test have been met.

The court finds unpersuasive the defendants' argument that each Count of the Indictment incorporates by reference *all* of the factual allegations set forth in Count One. Although the Indictment could have been structured to state with more particularity the specific facts upon which each Count relies, the court finds the Indictment is sufficiently clear to put the defendants on notice of the crimes with which they have been charged. The Eighth Circuit Court of Appeals has considered the minimum requirements for a

sufficient indictment on numerous occasions.  In *United States v. Cuervo*, 354 F.3d 969 (8th Cir. 2004), the court explained:

> "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 41 L. Ed. 2d 590 (1974); *see [United States v.] Dolan*, 120 F.3d [856,] 864 [(8th Cir. 1997)] ("To be sufficient, an indictment must fairly inform the defendant of the charges against him and allow him to plead double jeopardy as a bar to future prosecution."). Typically an indictment is not sufficient only if an essential element of the offense is omitted from it.  *[United States v.] White*, 241 F.3d [1015,] 1021 [(8th Cir. 2001)].

*Cuervo*, 354 F.3d at 983.  *See Bousley v. United States*, 523 U.S. 614, 618, 118 S. Ct. 1604, 1609, 140 L. Ed. 2d 828 (1998) ("[T]he first and most universally recognized requirement of due process" is that a defendant receive "real notice of the true nature of the charge against him.") (quoting *Smith v. O'Grady*, 312 U.S. 329, 334, 61 S. Ct. 572, 574, 85 L. Ed. 859 (1941)).

The Indictment in the present case meets the requirements of due process, by placing the defendants on notice of the true nature of the charges against them.

## B.  Double Jeopardy:  The Second Look

The defendants also argue sections 1035 and 1001 are cumulative or multiplicitous because they require proof of the same facts.  The Government argues Congress evidenced its intent that violations of the two statutes be separately punishable.  The Government claims the elements of sections 1001 and 1035 are different because section 1001 requires a false statement within the Government's jurisdiction, while section 1035

28

requires a false statement in connection with a health care matter. The defendants respond that the Government is making a distinction without a difference because under the facts of this case, the health care benefits programs for purposes of section 1035 are Medicare and Medicaid, and there can be no argument that those programs are not under the Government's jurisdiction. Therefore, they argue that proving a violation of section 1035 *ipso jure* encompasses a violation of section 1001.

The defendants argue further that although it is clear from the legislative history of section 1035 that Congress was aware of the existence of section 1001, there is nothing in the legislative history to indicate Congress recognized or intended that a person who violates section 1035 could be subject to double punishment under both 1035 and 1001. (*See* Doc. No. 58-2, p. 6; citing *United States v. Sink*, 851 F.2d 1120, 1123-24 (8th Cir. 1988) ("Congress ordinarily does not intend multiple punishments for the commission of two offenses where those offenses proscribe the same conduct."), in turn citing *Whalen v. United States*, 445 U.S. 684, 691-92, 100 S. Ct. 1432, 1437-38, 63 L. Ed. 2d 715 (1980)). Instead, the defendants claim that because the bulk of the language of the two sections is identical, "[t]he clear implication is that Congress intended to extend the criminal penalties in existence for making false statements in a matter within the jurisdiction of the government to making false statements in a matter involving a health care benefit program." (Doc. No. 58-2, pp. 6-7)

The Government responds by noting that Congress, having recognized some health care false statement crimes were being prosecuted under section 1001, then passed section 1035 "without limiting its application to only those crimes that could not be prosecuted under the existing Section 1001." (Doc. No. 53, pp. 4-5) The Government relies on the fact that Congress never suggested the two statutes could not be applied together, and notes the court should not assume "'Congress was unaware that it had

29

created two different offenses permitting multiple punishment for the same act.'" (Doc. No. 53, p. 5, quoting *United States v. Woodward*, 469 U.S. 105, 109, 1051 S. Ct. 611, 613, 83 L. Ed. 2d 518 (1985); and citing *United States v. Bennett*, 44 F.3d 1364, 1373 (8th Cir. 1995); *United States v. Henderson*, 19 F.3d 917, 926 (5th Cir. 1994)).

The Government further notes Congress included both section 1001 and section 1035 in its statutory definition of a "Federal health care offense," which is specifically defined to include a violation of, or a criminal conspiracy to violate, section 1035 (*see* 18 U.S.C. § 24(a)(1)), and section 1001 "if the violation or conspiracy relates to a health care benefit program" (*see* 18 U.S.C. § 24(a)(2)). (Doc. No. 53, p. 6)

In evaluating the two statutes pursuant to the *Blockburger* test, the court first will compare the elements necessary to prove a violation of each of the statutes.

A defendant must knowingly and willfully:

| Section 1001 | Section 1035 |
|---|---|
| (in a matter within jurisdiction of the federal government) | (in a matter involving a health care benefit program) |
| falsify, conceal, or cover up a material fact, by a trick, scheme, or device; or | falsify, conceal, or cover up a material fact, by a trick, scheme, or device; or |
| make a materially false, fictitious, or fraudulent statement or representation; or make or use a false writing or document knowing it contains a materially false, fictitious, or fraudulent statement or entry. | make a materially false, fictitious, or fraudulent statement or representation; or make or use a false writing or document knowing it contains a materially false, fictitious, or fraudulent statement or entry, *in connection with* delivery of or payment for health care benefits, items, or services. |

Thus, the differences in the elements required to prove a violation of the two statutes are as follows: the section 1001 act must be done in a matter that is within the jurisdiction of the federal government, while the section 1035 act must be done in a matter involving a health care benefit program, and in connection with delivery of or payment for health care benefits, items, or services.

The court notes that a health care benefit program involved in a section 1035 violation may or may not fall under the jurisdiction of the federal government. A person could violate section 1035 in connection with the delivery of health care services under a private health care benefit program and not concurrently violate section 1001. Conversely, a person could violate section 1001 in connection with any number of matters that fall within the jurisdiction of the federal government but have nothing to do with a health care benefit program.

In the present case, the only way one reaches the conclusion urged by the defendants is by considering the particular factual allegations underlying the current charges. Clearly, *every* violation of section 1035 that involves a *federal* benefit program such as Medicare or Medicaid necessarily will entail a violation of section 1001. This gives rise to the question of whether, under *Blockburger*, the court is permitted to consider the analysis within the factual context of an individual case. The court finds it is not. The test must be applied by focusing on the statutory elements of the offense, and not on the particular facts of the case. *See Albernaz v. United States*, 450 U.S. 333, 338, 101 S. Ct. 1137, 1142, 67 L. Ed. 2d 275 (1981) ("'As *Blockburger* and other decisions applying its principle reveal . . . the Court's application of the test focuses on the statutory elements of the offense.'") (quoting *Iannelli v. United States*, 420 U.S. 770, 785 n.17, 95 S. Ct. 1284, 1293 n.17, 43 L. Ed. 2d 616 (1975)).

However, even if the court had found both statutes to proscribe identical conduct, the court still would find charging the defendants under both statutes is permissible because the court finds Congress expressed its intent clearly. The court is persuaded by the reasoning in *United States v. Woodward*, 469 U.S. 105, 105 S. Ct. 611, 83 L. Ed. 2d 518 (1985), in which the Court applied the *Blockburger* test to determine whether a currency reporting violation necessarily included proof of a section 1001 offense. In its analysis, which parallels the analysis in the present case, the Court held as follows:

> It is clear that in passing the currency reporting law, Congress'[s] attention was drawn to 18 U.S.C. § 1001, but at no time did it suggest that the two statutes could not be applied together. We cannot assume, therefore, that Congress was unaware that it had created two different offenses permitting multiple punishment for the same conduct. . . .

*Woodward*, 469 U.S. at 109, 105 S. Ct. at 613 (citing *Albernaz*, 450 U.S. at 341-42, 101 S. Ct. at 1143-44).

The Court further found that Congress's "intent to allow punishment under both 18 U.S.C. § 1001 and [the currency reporting statute] is shown by the fact that the statutes 'are directed to separate evils.'" *Id.* (quoting *Albernaz*, 450 U.S. at 343, 101 S. Ct. at 1144). The *Woodward* Court noted that section 1001 "was designed 'to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described.'" *Id.* (quoting *United States v. Gilliland*, 312 U.S. 86, 93, 61 S. Ct. 518, 522, 85 L. Ed. 598 (1941)). On the other hand, the purpose of section 1035 is to "combat waste, fraud, and abuse in health insurance and health care delivery." 1996 WL 579893 (Leg. Hist.), Introduction to H.R. Conf. Rep. 104-736 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1990. *Cf. United States v. Hairston*, 64 F.3d 491, 496 (9th Cir. 1995) (no double jeopardy violation for conviction

under 18 U.S.C. §§ 2111 and 2114, which only differ in their jurisdictional element) (cited with approved in *United States v. Gladfelter*, 168 F.3d 1078, 1084 (8th Cir. 1999).

The court finds the legislative history reveals Congress's intent that conduct may be punishable under both section1001 and section 1035. The court therefore recommends denial of Dose's and Hinman's motions to dismiss or to require the Government to elect counts.

## C. Sufficiency of Charging Language in Count Six

Hinman argues separately that Count Six of the Indictment fails to allege properly a violation of Title 18, United States Code, section 1516. Specifically, Hinman argues Count Six "fails to sufficiently allege an intent to deceive the United States." (*See* Doc. No. 91, p. 6) He argues an "intent to deceive" requires a "level of knowledge that the alleged misrepresentation or omission would or should be communicated to the federal government." (*Id.*)

The court finds section 1516 contains no scienter requirement with respect to the jurisdictional prerequisites for a conviction under the statute. The court has found no authorities, and Hinman has cited none, holding a defendant must know the auditor he seeks to deceive is performing official duties on behalf of the federal government. The Indictment sufficiently alleges the defendants acted with the intent to deceive the DIA auditor. Whether or not the defendants knew, or had reason to know, the DIA auditor was acting on behalf of the Government is irrelevant to their culpability. As noted above with respect to Hinman's argument regarding the section 1001 allegations, the similar language in section 1516 is jurisdictional in nature and is irrelevant to the defendant's

intent to deceive. *See United States v. Hildebrandt*, 961 F.2d 116, 118-19 (8th Cir. 1992).

Section 1516 prohibits a person who, "with intent to deceive or defraud the United States, endeavors to influence, obstruct, or impede a Federal auditor in the performance of official duties. . . ." 18 U.S.C. § 1516(a). Count Six alleges the defendants "with intent to deceive and defraud the United States, endeavored to influence, obstruct, and impede a Federal auditor, namely a DIA surveyor, in the performance of official duties. . . ." (Doc. No. 94, Count Six) The court finds the requisite intent is satisfied if the Government proves the defendants intended to influence, obstruct, or impede an official auditor, whether or not they knew the auditor was acting on behalf of the federal government. Accordingly, the court recommends Hinman's motion to dismiss Count Six for failure to state an offense be denied.

## IV.  CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED,** unless any party files objections to this Report and Recommendation as specified below, that Dose's and Hinman's motions (Doc. Nos. 106 & 113; *see also* Doc. Nos. 52 & 58) to dismiss Counts, or require the Government to elect between Counts, be **denied** on all grounds, and Hinman's motion (Doc. No. 57, reasserted in Doc. No. 109, ¶ 9; *see* Doc. No. 91) to dismiss Count Six for failure to state a claim also be **denied**.

Any party who objects to this Report and Recommendation must serve and file specific, written objections by **May 6, 2005**. Any responses to an opposing party's objections must be filed by **May 16, 2005**.

**IT IS SO ORDERED.**

**DATED** this 22nd day of April, 2005.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT